UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TIMOTHY A MILLER end                                                                      PLAINTIFFS
LISA MILLER,


v.                                                                        CIVIL ACTION NO. 3:05-CV-42-S


WELLS FARGO & COMPANY, et al.                                                           DEFENDANTS


### MEMORANDUM OPINION

This matter is before the court on two separate but interrelated motions:  Trans Union, LLC's ("Trans Union") motion for summary judgment (DN 162), and Equifax Inc. ("Equifax Inc.") and Equifax Information Services, LLC's ("Equifax") motion for summary judgment (DN 163).[1] The plaintiffs, Tim and Lisa Miller (collectively, the "Millers") filed this action against Trans Union, Equifax Inc., Equifax, and Wells Fargo Bank ("Wells Fargo") alleging violations of the Fair Credit Reporting Act, and state common law and statutory claims.[2]

### BACKGROUND

Mr. Miller obtained a Wells Fargo home mortgage loan in 1999.  In July and August 2002, Wells Fargo incorrectly reported to numerous credit reporting agencies, including Trans Union and Equifax, that Mr. Miller's mortgage loan account had been included in a bankruptcy filing.  It is undisputed that Mr. Miller has never filed for bankruptcy.

---

[1] Equifax Inc. contends that it is not a proper defendant in this action and should be dismissed.  The plaintiffs have agreed to the dismissal of Equifax Inc.

[2] Experian Information Solutions, Inc. ("Experian") and CSC Credit Services, Inc. ("CSC") were named as defendants in this action as well.  The Millers' claims against these defendants were previously settled and dismissed.

The Millers became aware that the loan was incorrectly being reported by Trans Union, Equifax, and the other credit reporting agencies as included in bankruptcy in September 2002, when Mr. Miller attempted to refinance the loan with Wells Fargo. Wells Fargo contends that on September 11, 2002, after it learned of the error, it prepared a UDF correction form[3] and sent it to Trans Union, Equifax, and the other credit reporting agencies. According to Wells Fargo, this UDF correction form contained the necessary information to remove the bankruptcy notation from Mr. Miller's credit report. After verifying that the bankruptcy notation was in error, Wells Fargo granted Mr. Miller a new loan, the proceeds of which Mr. Miller used to pay the previous loan in full.

In November 2002, the Millers approached Wells Fargo for the purpose of obtaining financing to purchase a tract of land on which to build a new home (the "Beckley Station" property). After being approved for the loan, the Millers learned from Wells Fargo that the bankruptcy notation had reappeared on Mr. Miller's credit report. Wells Fargo rescinded its loan commitment on January 9, 2003, the day the transaction was to close. Later that day, Mr. Miller was able to secure a loan from PNC Bank. The PNC loan, however, was a one-year loan, as opposed to the traditional 30 year mortgage loan or multi-year adjustable rate mortgage loan which the Millers had sought.

The Millers immediately began searching for more traditional financing to pay off the PNC loan. In mid-January 2003, the Millers applied for a loan with Magellan Mortgage. The Millers allege that their loan application was initially denied due to the erroneous bankruptcy notation, which again appeared on Mr. Miller's credit report dated January 30, 2003. The Millers also applied for credit with National City Bank around this time as well, but allege they were denied on the basis of an Equifax credit report which included the bankruptcy notation.

---

[3] A UDF is an industry term for a "Universal Data Form" and is commonly used by Wells Fargo to notify credit reporting agencies about errors or change that should be made to an account.

- 3 -

The Millers once again contacted Wells Fargo. On February 3, 2003, Wells Fargo sent Mr. Miller a "to whom it may concern" letter confirming that Mr. Miller never filed for bankruptcy and stating that a "letter of correction" would be sent to the four major credit reporting agencies to delete the bankruptcy notation. The Millers also allege that on February 3, 2003, Mr. Miller contacted Trans Union and Equifax to dispute the bankruptcy notation.

On February 11, 2003, Wells Fargo sent Mr. Miller another letter, advising him that another UDF was submitted to the four major credit reporting agencies so that they could update their records and remove any bankruptcy notation from his account. The UDF sent by Wells Fargo, however, listed the wrong account number and was not successful in removing the bankruptcy notation. Assuming that the error had been corrected, the Millers again attempted to obtain a loan from Magellan Mortgage. On April 2, 2003, Magellan obtained Mr. Miller's credit report. The Millers once again discovered that the bankruptcy notation had not been removed. Magellan nevertheless provided the Millers with a loan.

Later in April 2003, the Millers applied for an increased line of credit with their Home Depot account. The Millers allege that the application was denied on the basis of an Equifax credit report that was still reporting the erroneous bankruptcy notation. The Millers also allege that in September 2003, Mr. Miller was denied a Lowes credit card, again due to an Equifax credit report that was still reporting the bankruptcy notation.

Mr. Miller once again contacted Wells Fargo to apprise them that the bankruptcy was still appearing on his credit report. Mr. Miller also contacted Equifax in order to dispute the information contained in his credit report. Because the Millers lived in a zip code location designated as an area of the country to be handled by Equifax's affiliate, CSC, Equifax instructed Mr. Miller to contact that company with his dispute. Mr. Miller then proceeded to contact CSC to dispute the information that appeared on his Equifax credit report.

In response to Mr. Miller's contact Wells Fargo sent another UDF to the credit reporting agencies on September 24, 2003. Like the previous UDF sent by Wells Fargo, this UDF also referenced the wrong account number, and had no effect in removing the bankruptcy notation. CSC, however, sent an Automated Consumer Dispute Verification (ACDV) notice to Wells Fargo. The ACDV requested that Wells Fargo confirm that Mr. Miller's account had never been included in bankruptcy. On September 23, 2003, after receiving the ACDV, Wells Fargo confirmed to CSC and Equifax that Mr. Miller's account should be modified so as to not include any bankruptcy notation. Wells Fargo contends that the modification sent to CSC and Equifax was also automatically sent to the other credit reporting agencies as well.

On October 1, 2003, after receiving confirmation of the modification from Wells Fargo, Equifax removed the bankruptcy notation from Mr. Miller's credit report. Trans Union also received confirmation of the modification, but it alleges that while it had reported a bankruptcy notation on Mr. Miller's credit report in the past, it was not doing so at the time it received the modification confirmation. However, Trans Union reinserted the bankruptcy notation into his credit report on October 16, 2003.

In July 2004, the Millers sought to obtain a loan from Fifth Third Bank in order to consolidate their credit card debt. The Millers allege that Fifth Third obtained Mr. Miller's credit report, which included the bankruptcy notation. According to the Millers, Fifth Third agreed to make the loan to the them provided that they close all of their outstanding credit card accounts. In October 2004, the Millers sought to reopen one of these credit card accounts. During the process, the Millers allege that they obtained a copy of Mr. Miller's credit report and discovered that Trans Union was once again reporting the bankruptcy notation.

The Millers hired legal counsel in November 2004. Through counsel, the Millers contacted Wells Fargo again. Wells Fargo contends that it contacted all of the credit reporting agencies on November 15, 2004, to confirm that the bankruptcy notation had been removed from Mr. Miller's credit report. According to Wells Fargo, it was assured by Trans Union and Equifax that they had removed the bankruptcy notation from their systems. Trans Union however, continued to report the bankruptcy. In December 2004, the Millers were again denied credit, allegedly on the basis of a bankruptcy notation in Mr. Miller's Trans Union credit report. The Millers filed this action on January 21, 2005 against Trans Union and Equifax for violations of the Fair Credit Reporting Act (FCRA), the Kentucky Consumer Protection Act (KCPA), outrage, defamation, libel, and invasion of privacy. Trans Union and Equifax now move for summary judgment with respect to these claims.

## DISCUSSION

### I. Summary Judgment Standard

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S.

253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

## II. FCRA Claims

The Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"), is designed to protect consumers from inaccurate information in consumer reports by establishing credit reporting procedures which "utilize correct, relevant and up-to date information in a confidential and responsible manner." *Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961, 965 (6th Cir.1998). "The FCRA places distinct obligations on three types of entities: (1) consumer reporting agencies; (2) users of consumer reports; and (3) furnishers of information to consumer reporting agencies." *Stafford v. Cross Country Bank*, 262 F.Supp.2d 776, 782 (W.D.Ky. 2003).

It is undisputed that Trans Union and Equifax are consumer reporting agencies  The Millers allege that as consumer reporting agencies, Trans Union and Equifax negligently and willfully violated their duties under 15 U.S.C. §§ 1681e(b) and 1681i. Under the FCRA, any person who is found negligent in failing to comply with its FCRA duties is liable to the consumer for actual damages sustained as a result of the failure. 15 U.S.C. § 1681*o*. If the failure to comply is willful, a consumer is entitled to actual damages or statutory damages, and punitive damages. 15 U.S.C. § 1681n.

### A. FCRA Statute of Limitations

As a preliminary matter, Trans Union and Equifax contend that, under the FCRA statute of limitations, they cannot be liable for FCRA violations occurring prior to January 21, 2003.[4] We agree. The statute of limitations for claims brought under the FCRA is set forth in § 1681p. The current version of § 1681p became effective March 31, 2004 and provides that a FCRA claim must be brought not later

---

[4] Equifax first raised this argument in its Reply brief. As such, the Millers argue that the court should not consider this argument, and should similarly not consider other arguments first raised by Equifax in its Reply brief. Given that the Millers were afforded the opportunity to respond to these arguments in their Sur-reply brief, the court will consider these arguments.

than the earlier of "(1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation is the basis for such liability occurs." 15 U.S.C. § 1681p. However, a statute may not be applied retroactively absent a clear indication from Congress that it intended such a result. *Webb v. Bob Smith Chevrolet, Inc.*, No. 3:04-CV-66, 2005 WL 2065237 at *4 (W.D.Ky. Aug. 24, 2005) (citing *Jones v. Fidelity & Columbia Trust Co.*, 73 F.2d 446 (6th Cir.1934)). "Generally speaking, the controlling law is that in effect on the date of the injury." *Webb* 2005 WL 2065237 at *4. Accordingly, the prior version of § 1681p is applicable to the Millers' claims that arose prior to March 31, 2004. The prior version of § 1681p provided that a FCRA claim must be brought "within two years from the date on which liability arises." 15 U.S.C. § 1681p, Pub.L No. 91-508 (1970).[5]  The Millers filed this action on January 21, 2005. Therefore, to the extent the Millers' FCRA claims against Trans Union and Equifax arose prior to January 21, 2003, they are barred by the FCRA statute of limitations.

**B. Section 1681e(b)**

Section 1681e(b) states that consumer reporting agencies that prepare credit reports must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). The exercise of reasonable care is determined by the reasonably prudent person standard. *Bryant v. TRW Inc.*, 689 F.2d 72, 78 (6th Cir. 1982). In order to sustain a claim under § 1681e(b), it must be shown that (1) inaccurate information was included in a consumer's credit report, (2) the inaccuracy was due to the defendant's failure to follow reasonable procedures to assure maximum possible accuracy, (3) the consumer suffered injury, and (4) the consumer's injury was caused by the inclusion of the inaccurate entry. *Bryant v. TRW Inc.*, 487 F.Supp. 1234, 1238 (E.D.Mich. 1980), *aff'd*, 689 F.2d 72 (6th Cir. 1982).

---

[5] The prior version of § 1681p contains an exception which extends the statute of limitations, but the exception is not applicable to this action.

There is no dispute that Mr. Miller never filed for bankruptcy and that any such notation on his credit report was inaccurate.  However, it is well established that the FCRA is not a strict liability statute and the mere reporting of inaccurate information is not enough to create liability.  *Spence v. TRW, Inc.*, 92 F.3d 380, 383 (6th Cir. 1996).  A consumer reporting agency is held only to the duty to employ reasonable procedures to assure maximum possible accuracy.  *Id.*  The determination of the reasonableness of a consumer reporting agency's procedures may be determined on summary judgment only if the reasonableness or unreasonableness of the procedures is beyond question.  *See Sarver v. Experian Information Solutions*, 390 F.3d 969, 971 (7th Cir. 2004).  However, such determination is typically a fact question reserved for the jury.  *Boris v. Choicepoint Services, Inc.*, 249 F.Supp.2d 851, 856 (W.D.Ky. 2003); *see also Poore v. Sterling Testing Systems, Inc.*, 410 F.Supp.2d 557, 570-71 (E.D.Ky. 2006) ("the issue of whether the agency failed to follow reasonable procedures will be a jury question in the overwhelming majority of cases") (quoting *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 416 (4th Cir. 2001)).

It is undisputed that Trans Union reported the bankruptcy notation on Mr. Miller's credit report after it received information from Wells Fargo in July and August 2002 which indicated that Mr. Miller's account was included in bankruptcy.  Trans Union alleges that it then stopped reporting the bankruptcy notation in November 2002.  It is undisputed that Trans Union then began reporting the bankruptcy notation again on October 16, 2003.  Trans Union contends that it began reporting the bankruptcy a second time because Wells Fargo re-reported that Mr. Miller had filed for bankruptcy.  Trans Union argues that a consumer reporting agency is deemed to have followed reasonable procedures even when it reports an inaccurate item of information when it is not on notice that the furnisher of the inaccurate information was unreliable.  Trans Union maintains that it was not on notice that Wells Fargo was an unreliable source of information and can therefore not be liable for violating § 1681e(b) by failing to

follow reasonable procedures to assure maximum possible accuracy of Mr. Miller's credit information.

Trans Union's argument ignores Wells Fargo's contention that it never re-reported that Mr. Miller filed for bankruptcy. Therefore, a genuine issue of fact exists as to whether, on October 16, 2003, Trans Union incorrectly began reporting that Mr. Miller had filed for bankruptcy without receiving such information from Wells Fargo. The report would have occurred after Trans Union was on notice that Mr. Miller had, in fact, never filed for bankruptcy. Such an action would clearly indicate a failure to employ reasonable procedures to assure maximum possible accuracy of Mr. Miller's credit information and would be actionable under § 1681*o*. *See Gohman v. Equifax Information Services, LLC*, 395 F.Supp.2d 822, 826 (D.Minn 2005) ("[a] CRA may be liable under section 1681e if it had notice of credit report inaccuracies before preparing the report"). In addition, such an action would sufficiently establish willful noncompliance under § 1681n. To prevail on a claim for willful noncompliance with the FCRA under § 1681n, a plaintiff must show that a defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." *See Stafford,* 262 F.Supp.2d at 788. A reasonable jury could conclude that, by re-reporting a bankruptcy notation on Mr. Miller's credit report without receiving that information from a furnisher, Trans Union consciously disregarded the Millers' rights.

Equifax, like Trans Union, also reported the bankruptcy notation on Mr. Miller's credit report after it received the information from Wells Fargo in July and August 2002. The Millers have offered evidence that Wells Fargo sent a UDF on September 11, 2002, to Equifax and the other credit reporting agencies instructing them to remove the bankruptcy notation from Mr. Miller's credit report. They have also offered evidence indicating that Equifax failed to comply with this instruction and did not remove the bankruptcy notation until September 2003. Such failure may indicate a failure to employ reasonable procedures to assure maximum possible accuracy of Mr. Miller's credit information and is actionable under § 1681*o*. The Millers have offered evidence indicating that both they and Wells Fargo made

additional requests to Equifax with respect to the removal of the bankruptcy notation and that Equifax failed to do so. A reasonable jury could conclude that the failure to take action constituted a conscious disregard for the Millers' rights. Therefore, Equifax's alleged failure to employ reasonable procedures is actionable under § 1681n as well.

**C. Section 1681i**

The FCRA imposes the following duty to reinvestigate disputed information:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information or delete the item from the file...

15 U.S.C. § 1681i(a)(1). Once a reporting agency is informed of a potential mistake, the agency has a duty to reinvestigate the report within thirty days. 15 U.S.C. § 1681i(a)(1).

The Millers claim that Mr. Miller contacted both Trans Union and Equifax on February 3, 2003, to dispute the bankruptcy. Mr. Miller stated as much in his deposition testimony and has provided his handwritten notes which he alleges confirms that he made contact. Such evidence is sufficient to create a genuine issue of fact as to whether Trans Union and Equifax were, at that time, obligated to reinvestigate Mr. Miller's dispute. Neither Trans Union nor Equifax conducted a reinvestigation pursuant to 15 U.S.C. § 1681i(a)(1) at that time and the failure to do so is actionable under § 1681*o* and § 1681n.

The Millers also claim that Trans Union violated § 1681i(a)(5)(B) by re-reporting the bankruptcy notation which it had previously deleted without obtaining a certification from Wells Fargo that the information was complete and accurate and without notifying Mr. Miller. The Millers also allege that Trans Union violated § 1681i(a)(5)(C) by failing to maintain reasonable procedures designed to prevent the reappearance of information deleted pursuant to a reinvestigation. In order for a plaintiff to state a

valid claim under Section 1681i(a)(5)(B) and (C) the re-reported information must have been deleted pursuant to a § 1681i(a)(1) reinvestigation. *See* 15 U.S.C. § 1681i(a)(5)(A)-(C). A § 1681i(a)(1) reinvestigation occurs only when the consumer has notified the consumer reporting agency of a dispute. In this case, although the Millers allege that they notified Trans Union of a dispute in February 2003, no reinvestigation was ever conducted by Trans Union. As a result, Trans Union did not delete the bankruptcy notation pursuant to a reinvestigation and cannot be liable for violating § 1681i(a)(5)(B) or (C). Accordingly, Trans Union is entitled to summary judgment as to the Millers claims arising under § 1681i(a)(5)(B) and (C).

**D. Damages**

Sections 1681e(b) and 1681i(a)(1) both require a showing of injury and that the injury was caused by the credit reporting agency's failure to comply with its duties under those sections. It is well settled that actual damages under the FCRA are not limited to pecuniary out of pocket losses and may instead include non-pecuniary damages for humiliation, mental distress, and injury to one's reputation and creditworthiness. *See Boris*, 249 F.Supp.2d at 859.

The Millers allege they suffered actual damages occurring after January 21, 2003, in the form of credit denials, losses associated with obtaining credit, and mental distress. The Millers claim these losses are attributable to Trans Union and Equifax's alleged failure to comply with the FCRA. Specifically, the Millers' claim that they applied for a loan with Fifth Third Bank in July 2004 and were required to close all of their outstanding credit card accounts in order to obtain the loan. The Millers have provided evidence indicating that this requirement was imposed as a result of Fifth Third Bank's concerns about the bankruptcy notation on Mr. Miller's Trans Union credit report and resulted in the loss of credit and benefits they had accrued in relation to that credit.[6] The Millers also allege that they applied

---

[6] Trans Union contends that the Millers have only identified credit reports containing the bankruptcy notation
(continued...)

for, and were denied, a Lowes credit card on September 6, 2003 and have provided evidence indicating that the denial was due to the bankruptcy notation on Mr. Miller's Equifax credit report. Based on the loss of credit attributable to the Fifth Third Bank loan and the Lowes credit denial the Millers have produced sufficient evidence to create a genuine issue of fact as to whether they suffered actual damages caused by inaccurate credit reports issued by Trans Union and Equifax.[7]

Moreover, proof of actual damages is not necessary in order to sustain an award of punitive damages under § 1681n. *See TRW Inc. v. Andrews,* 534 U.S. 19, 35, 122 S.Ct. 441, 151 L.Ed.2d (2001). Because an issue of fact exists as to whether Trans Union and Equifax's alleged FCRA violations were willful, in violation of § 1681n, the Millers need not prove actual damages.

**E. Standing**

Trans Union and Equifax contend that Mrs. Miller lacks standing to assert FCRA claims in this action. The FCRA is "interpreted to provide standing to a party when a credit report damages that party's individual creditworthiness." *Williams v. Equifax Credit Information Services*, 892 F.Supp. 951, 955 (E.D.Mich. 1995). In *Williams*, a wife's ability to obtain credit was affected by an error in her husband's credit report. The court determined that since she suffered impairment to her own ability to

---

[6](...continued)
that were produced by Info 1/Land America and RELS Reporting, and that these credit reports are not Trans Union credit reports. However, the Millers have provided a Trans Union credit report dated December 13, 2004 indicating that a Trans Union credit report was viewed by numerous third parties including Fifth Third Bank. In addition, because Trans Union is listed on the Info1/Land America and RELS Reporting credit reports as reporting a bankruptcy on Mr. Miller's account, an issue of fact exists as to whether Trans Union reported the bankruptcy to Fifth Third Bank and other third parties.

[7]Because these particular losses create an issue of fact as to whether the Millers' suffered actual damages attributable to Trans Union and Equifax, it is unnecessary to consider the additional arguments as to actual damages raised by Trans Union and Equifax. However, we note that their argument that these losses, and other losses associated with the purchase and development of the Beckley Station property, are non-recoverable business losses is unpersuasive. While it is true that the FCRA does not provide compensation for business related losses, *see Cheatham v. McCormick*, No. 95-6558, 1996 WL 662887, at *3 (6th Cir. Nov. 12, 1996), the record in this case does not indicate that losses associated with the Beckley Station property are business losses. At most, the record reflects a genuine issue of fact as to whether the purchase and development of the Beckley Station property was a business venture.

obtain credit when she was temporarily unable to secure re-financing on property of which she was a co-owner due to the error of a credit reporting agency, she had standing to sue. *Id.* at 955. In the case before this court, the Millers have provided sufficient evidence indicating that Mrs. Miller's creditworthiness was damaged as a result of the bankruptcy notation on Mr. Miller's credit report to withstand summary judgment. Although Mrs. Miller testified that she had no credit of her own, the record indicates that she jointly applied for credit with Mr. Miller and that her ability to obtain such credit, and the terms upon which she was able to obtain credit, were affected by the error on Mr. Miller's credit report. Accordingly, Mrs. Miller has standing to assert FCRA claims in this action.

### III. State Law Claims

**A. Qualified Immunity**

Trans Union and Equifax assert that they are entitled to qualified immunity from the Millers' state law claims for defamation, libel, invasion of privacy, and outrage. Trans Union and Equifax rely on 15 U.S.C. § 1681h(e), which provides, in relevant part:

> no consumer may bring any action... in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency... except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e). Courts have held that in § 1681h(e) cases, a statement is made with "malice" if it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Stafford*, 262 F.Supp.2d at 789 n.11; *see also Jordan v. Trans Union LLC*, 377 F.Supp.2d 1307, 1309 (N.D.Ga.2005); *Graham v. CSC Credit Services, Inc.*, 306 F.Supp.2d 873, 882 (D.Minn. 2004). Because the facts that create an issue of fact as to whether Equifax and Trans Union willfully violated the FCRA in this case also create an issue of fact as to whether they reported a bankruptcy notation on Mr. Miller's account with knowledge that it was false or with reckless disregard as to whether it was false or not, we find that § 1681h(e) does not afford qualified immunity to them in this case.

**B. Defamation**

In Kentucky, "[d]efamation by writing... is libel." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793-94 (Ky. 2004). Thus, the Millers' claims against Trans Union and Equifax for defamation and libel are one and the same. A prima facie case for defamation requires proof of (1) defamatory language, (2) about the plaintiff, (3) which is communicated to someone other than the party defamed, and (4) which causes injury to reputation. *Id.*

A report indicating that Mr. Miller had filed for bankruptcy when he had not done so is clearly defamatory. *See id.* ("defamatory language is broadly construed as language that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him"). The Millers have provided evidence that both Trans Union and Equifax credit reports were provided to third parties and that Mr. Miller's reputation was injured as a result of the false reports. As such, summary judgment is inappropriate as to Mr. Miller's claim for defamation against Trans Union and Equifax. However, because neither Trans Union nor Equifax reported defamatory information about Mrs. Miller, her defamation claims must be dismissed.

**C. Invasion of Privacy**

In Kentucky, the right to privacy is invaded by (1) unreasonable intrusion upon seclusion of another, (2) appropriation of the other's name or likeness, (3) unreasonable publicity given to the other's private life, or (4) publicity that unreasonably places the other in a false light before the public. *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 887. The Millers' claims against Trans Union and Equifax for invasion of privacy are based on their allegation that Trans Union and Equifax placed them in a false light by falsely reporting that Mr. Miller had filed for bankruptcy.

In order to sustain an action for false light invasion of privacy, a plaintiff must demonstrate that (1) the false light in which he was placed would be highly offensive to a reasonable person and, (2) the

- 14 -

publisher had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed. *Id.* at 888. The court has already determined that the Millers have provided evidence sufficient to withstand summary judgment as to whether (1) Trans Union and Equifax reported the bankruptcy to third parties, (2) a false report that Mr. Miller had filed for bankruptcy would be defamatory and (3) Trans Union and Equifax acted with knowledge or with reckless disregard as to the falsity of the bankruptcy notation. The court also finds that Trans Union and Equifax's false report that Mr. Miller had filed for bankruptcy would be highly offensive to a reasonable person. Accordingly, Trans Union and Equifax are not entitled to summary judgment as to Mr. Miller's invasion of privacy claim. However, because neither Trans Union nor Equifax reported false information about Mrs. Miller, her claim for invasion of privacy must be dismissed.

### D. Outrage

To establish a prima facie case of outrage under Kentucky law, a plaintiff must show that (1) the wrongdoer's conduct was intentional or reckless, (2) the conduct was outrageous and intolerable in that it offends the generally accepted standards of decency and morality, (3) a causal connection exists between the wrongdoer's conduct and the emotional distress, and (4) the emotional distress was severe. *Stringer,* 151 S.W.3d at 788. In *Stringer*, the Kentucky Supreme Court held that the conduct at issue must be "extreme and outrageous" noting that:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

151 S.W.3d at 789 (quoting Restatement (Second) of Torts § 46(1) cmt. d). Neither the conduct of Trans Union or Equifax rises to the level of "extreme or outrageous" as required by Kentucky law. Accordingly, the Millers' outrage claims against both Trans Union and Equifax will be dismissed.

**E. Kentucky Consumer Protection Act**

The KCPA protects consumers from "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS 367.170(1). KRS 367.220 provides a private right of action under the KCPA for "any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property...as a result of the use [of any practice declared unlawful by 367.170]." According to Trans Union, its only direct contact with the Millers occurred on December 13, 2004, when Mr. Miller requested a Trans Union consumer disclosure, which it provided to him. The Millers assert that consumers are generally forced to "buy" their credit reports and credit standing from credit reporting agencies. However, the Millers have provided no evidence to this court that they purchased their credit information from Trans Union. Accordingly, the Millers' KCPA claim against Trans Union will be dismissed.[8]

A separate order will be entered herein this date in accordance with this opinion.

---

[8] Equifax has not moved for summary judgment as to the Millers' KCPA claim on the basis that the Millers did not purchase credit information from it. Therefore, dismissal of the Millers' KCPA claims against Equifax is not appropriate.