UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TIMOTHY A MILLER and                                    PLAINTIFFS
LISA MILLER,


v.                                          CIVIL ACTION NO. 3:05-CV-42-S


WELLS FARGO & COMPANY, et al.                             DEFENDANTS


**MEMORANDUM OPINION**

This matter is before the court upon the motion of the defendants, Wells Fargo Home Mortgage,

Inc., Wells Fargo & Company, Wells Fargo Bank of Iowa, NA, and Wells Fargo Funding, Inc.

(collectively, "Wells Fargo") for summary judgment (DN 161).[1]  The plaintiffs, Tim and Lisa Miller

(collectively, the "Millers") filed this action against Wells Fargo, Trans Union, LLC ("Trans Union"),

and Equifax Information Services, LLC ("Equifax"), alleging violations of the Fair Credit Reporting Act,

and state common law and statutory claims.[2]

**BACKGROUND**

Mr. Miller obtained a Wells Fargo home mortgage loan in 1999.  In July and August 2002, Wells

Fargo incorrectly reported to numerous credit reporting agencies, including Trans Union and Equifax,

that Mr. Miller's mortgage loan account had been included in a bankruptcy filing.  It is undisputed that

---

[1] Wells Fargo contends that Wells Fargo Home Mortgage, Inc. is distinct from the other Wells Fargo entities and contends that it is the only Wells Fargo entity whose conduct is implicated by the FCRA.  Other than its assertions in its memorandum in support of its motion for summary judgment, Wells Fargo has provided no evidence supporting such contention.

[2] Experian Information Solutions, Inc. ("Experian") and CSC Credit Services, Inc. ("CSC") were named as defendants in this action as well.  The Millers' claims against these defendants were previously settled and dismissed.

Mr. Miller has never filed for bankruptcy. The bankruptcy reported on Mr. Miller's account was actually that of Mayra Mendez ("Mendez"), a New Jersey resident unrelated to Mr. Miller.[3]  Mendez's bankruptcy petition contained a one digit typographical error in her Social Security number. The error resulted in a filed petition which included the Social Security number of Mr. Miller rather than the Social Security number of Mendez.

At the time of the Mendez bankruptcy filing, Wells Fargo utilized computer software to electronically search bankruptcy filings based on Social Security numbers. The software compared the Social Security numbers listed in the bankruptcy filings with the Social Security numbers associated with Wells Fargo accounts. If a match occurred, the computer system would automatically notify the credit reporting agencies each month of all Wells Fargo borrowers whose accounts were included in bankruptcy. Because Mr. Miller's Social Security number was detected by the software, Wells Fargo's software incorrectly reported to the credit reporting agencies in July and August 2002, that Mr. Miller's loan account was included in bankruptcy.

The Millers became aware that the loan was being incorrectly reported by the credit reporting agencies as included in bankruptcy in September 2002, when Mr. Miller attempted to refinance the loan with Wells Fargo. Wells Fargo contends that on September 11, 2002, after it learned of the error, it prepared a UDF correction form[4] and sent it to the credit reporting agencies. According to Wells Fargo, this UDF correction form contained the necessary information to remove the bankruptcy notation from Mr. Miller's credit report. After verifying that the bankruptcy notation was in error, Wells Fargo granted Mr. Miller a new loan, the proceeds of which Mr. Miller used to pay the previous loan in full.

---

[3] Mendez is not a party to this action.

[4] A UDF is an industry term for a "Universal Data Form." UDFs are commonly used by Wells Fargo to notify credit reporting agencies about errors or changes that should be made to an account.

- 3 -

In November 2002, the Millers approached Wells Fargo for the purpose of obtaining financing to purchase a tract of land on which to build a new home (the "Beckley Station" property).  After being approved for the loan, the Millers learned from Wells Fargo that the bankruptcy notation had reappeared on Mr. Miller's credit report. Wells Fargo rescinded its loan commitment on January 9, 2003, the day the transaction was to close.  Later that day, Mr. Miller was able to secure a  loan from PNC Bank.  The PNC loan, however, was a one-year loan, as opposed to the traditional 30 year mortgage loan or multi-year adjustable rate mortgage loan which the Millers had sought.

The Millers immediately began searching for more traditional financing to pay off the PNC loan. In mid-January 2003, the Millers applied for a loan with Magellan Mortgage.  The Millers allege that their loan application was initially denied due to the erroneous bankruptcy notation, which again appeared on Mr. Miller's credit report dated January 30, 2003.  The Millers also applied for credit with National City Bank around this time as well, but allege they were denied on the basis of an Equifax credit report which included the bankruptcy notation.

The Millers once again contacted Wells Fargo.  On February 3, 2003, Wells Fargo sent Mr. Miller a "to whom it may concern" letter confirming that Mr. Miller never filed for bankruptcy and stating that a "letter of correction" would be sent to the four major credit reporting agencies to delete the bankruptcy notation.  The Millers allege that no such letter was sent.  The Millers also allege that on February 3, 2003, Mr. Miller contacted Trans Union, Equifax, and Experian to dispute the bankruptcy notation despite Wells Fargo's representations that this was not necessary.

On February 11, 2003, Wells Fargo sent Mr. Miller another letter, advising him that another UDF was submitted to the four major credit reporting agencies so that they could update their records and remove any bankruptcy notation from his account.  The UDF sent by Wells Fargo, listed the wrong account number and was not successful in removing the bankruptcy notation.  Assuming that the error

had been corrected, the Millers again attempted to obtain a loan from Magellan Mortgage. On April 2, 2003, Magellan obtained Mr. Miller's credit report. The Millers once again discovered that the bankruptcy notation had not been removed. Magellan nevertheless provided the Millers with a loan.

Later in April 2003, the Millers applied for an increased line of credit with their Home Depot account. The Miller's allege that the application was denied on the basis of an Equifax credit report that was still reporting the bankruptcy notation. The Millers also allege that in September 2003, Mr. Miller was denied a Lowe's credit card, again due to an Equifax credit report that was still reporting the bankruptcy notation.

Mr. Miller once again contacted Wells Fargo to apprise them that the bankruptcy was still appearing on his credit report. On September 24, 2003, the Millers received a letter from Wells Fargo stating that it had researched its records and instructed the credit reporting agencies to remove the bankruptcy notation. That same day Wells Fargo sent another UDF to the credit reporting agencies. However, like the previous UDF, this UDF also referenced the wrong account number, and had no effect in removing the bankruptcy notation.

In addition to contacting Wells Fargo after learning of the most recent reappearance of the bankruptcy notation, Mr. Miller also contacted Equifax in order to dispute the information contained in his credit report. Because the Millers lived in a zip code location designated as an area of the country to be handled by Equifax's affiliate, CSC, Equifax instructed Mr. Miller to contact that company with his dispute. Mr. Miller then proceeded to contact CSC to dispute the information that appeared on his Equifax credit report. In response, CSC sent an Automated Consumer Dispute Verification (ACDV) notice to Wells Fargo. The ACDV requested that Wells Fargo confirm that Mr. Miller's account had never been included in bankruptcy. On September 23, 2003, after receiving the ACDV, Wells Fargo confirmed to CSC and Equifax that Mr. Miller's account should be modified so as to not include any

bankruptcy notation.  Wells Fargo contends that the modification sent to CSC and Equifax was also automatically sent to the other credit reporting agencies as well.

On October 1, 2003, after receiving confirmation of the modification from Wells Fargo, Equifax removed the bankruptcy notation from Mr. Miller's credit report.  Trans Union also received confirmation of the modification, but contends that it while it had reported a bankruptcy notation on Mr. Miller's credit report in the past, it was not doing so at the time it received the modification confirmation. However, Trans Union reinserted the bankruptcy notation into his credit report on October 16, 2003.

In July 2004, the Millers sought to obtain a loan from Fifth Third Bank in order to consolidate their credit card debt.  The Millers allege that Fifth Third obtained Mr. Miller's credit report, which included the bankruptcy notation.  According to the Millers, Fifth Third agreed to make the loan to the them provided that they close all of their outstanding credit card accounts.  In October 2004, the Millers sought to reopen one of these credit card accounts.  During the process, the Millers allege that they obtained a copy of Mr. Miller's credit report and discovered that Trans Union was once again reporting the bankruptcy notation.

The Millers hired legal counsel in November 2004.  Through counsel, the Millers again contacted Wells Fargo regarding the bankruptcy notation.  On November 15, 2004, Wells Fargo contends that it contacted all of the credit reporting agencies to confirm that the bankruptcy notation had been removed from Mr. Miller's credit report.  According to Wells Fargo, it was assured by Trans Union, Equifax, and Experian that they had removed the bankruptcy notation from their systems.  Trans Union however, continued to report the bankruptcy.  In December 2004, the Millers were again denied credit, allegedly on the basis of a bankruptcy notation in Mr. Miller's Trans Union credit report.  The Millers filed this action on January 21, 2005 against Wells Fargo asserting claims for violations of the Fair Credit

Reporting Act (FCRA), the Kentucky Consumer Protection Act, outrage, defamation, libel, and invasion of privacy.  Wells Fargo now moves for summary judgment with respect to these claims.

## DISCUSSION

### I.  Summary Judgment Standard

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

### II.  FCRA Claims

The Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.*, was enacted to promote efficiency in the Nation's banking system and to protect consumer privacy.  *See TRW, Inc. v. Andrews*, 534 U.S. 19, 23, 122 S.Ct. 441, 151 L.Ed.2d (2001).  "The FCRA places distinct obligations on three types of entities: (1) consumer reporting agencies; (2) users of consumer reports; and (3) furnishers of

information to consumer reporting agencies." *Stafford v. Cross Country Bank*, 262 F.Supp.2d 776, 782 (W.D.Ky. 2003).

## A. Section 1681s-2

In relation to the Millers, Wells Fargo was a furnisher of information. The FCRA imposes a duty upon furnishers of credit information to report accurate information to consumer reporting agencies regarding a consumer's credit. 15 U.S.C. § 1681s-2(a)(1)(A). In addition, upon receiving notice from a credit reporting agency that a consumer disputes the information a furnisher has provided, the furnisher has the duty to: (1) conduct an investigation with respect to the disputed information; (2) review all of the relevant information provided to it by the credit agency; (3) report the results of its investigation to the credit reporting agency; and (4) correct any inaccuracies uncovered by the investigation by reporting them to each of the credit agencies. *See Bach v. First Union Nat. Bank*, 149 Fed.Appx. 354, 358-59 (6th Cir. 2005) (citing 15 U.S.C. § 1681s-2(b)(1)(A)-(D)). After receiving the required notice, the furnisher has thirty days with which to comply with these duties. 15 U.S.C. § 1681s-2(b)(2). While a consumer cannot bring a private cause of action for a furnisher's violation of its duty to report accurate information, consumers are authorized, under §§ 1681n and 1681*o*, to bring a private cause of action for a furnisher's willful or negligent violation of its § 1681s-2(b) duties.[5]

## B. Notice Triggering § 1681s-2(b) Duties

It is undisputed that Wells Fargo's report indicating that Mr. Miller's loan was included in bankruptcy was inaccurate. However, Wells Fargo was not obligated to comply with § 1681s-2(b) until it received notice from a *credit reporting agency* that Mr. Miller had disputed the information it provided.

---

[5] Section 1681*o* provides consumers with a cause of action for negligent noncompliance with § 1681s-2(b), permitting the recovery of actual damages and attorney fees. 15 U.S.C § 1681*o*. Section 1681n provides a cause of action for willful violations, entitling a consumer to recover punitive damages. 15 U.S.C. § 1681n..

*Stafford*, 262 F.Supp.2d at 783-84. Notification from the Millers was not enough to trigger Wells Fargo's duties under § 1681s-2(b). *See id.* (citations omitted).

The record clearly indicates that Wells Fargo first received notice that Mr. Miller disputed the information it had provided to the credit agencies in September 2002. Wells Fargo contends that the source of this notice was the Millers themselves. In support of this contention Wells Fargo points to the Millers' complaint which states that the Millers contacted Wells Fargo upon learning of the bankruptcy notation. Wells Fargo contends that it did not receive notice of Mr. Miller's dispute from a credit reporting agency until September 22, 2003, when it received the ACDV from CSC asking it to confirm that Mr. Miller's account had never been included in bankruptcy. As such, Wells Fargo contends that the Millers cannot establish that it is liable under the FCRA prior to September 22, 2003. The Millers argue that Wells Fargo received notice from a credit reporting agency in September 2002, and, in support, offer the testimony of Alberta Kirkpatrick, the Wells Fargo employee who handled both the September 2002 dispute and the September 2003 dispute. Kirkpatrick testified that in September 2002, Wells Fargo received notice of the bankruptcy notation dispute either from a credit reporting agency or the Millers. The distinction is critical for purposes of ascertaining when Wells Fargo's § 1681s-2(b) obligations were triggered.

While Kirkpatrick's testimony, viewed in isolation, might be sufficient to create a genuine issue of fact as to whether Wells Fargo's FCRA duties were triggered in September 2002, when this testimony is viewed in light of the entire record no such issue of fact exists. Kirkpatrick testified that she was unsure whether Wells Fargo first received notice of the inaccurate bankruptcy notation in September 2002 from a credit reporting agency or the Millers. The Millers allege that they provided such notice to Wells Fargo in September 2002. However, the Millers do not allege, nor does the record indicate, that they contacted a credit reporting agency to dispute the bankruptcy notation until February 2003. If the

Millers did not contact a credit reporting agency until February 2003, then no credit reporting agency could have contacted Wells Fargo until February 2003. Therefore, despite the fact that Kirkpatrick was unsure who first provided notice to Wells Fargo in September 2002, the court must conclude based on the Millers' own allegations that such notice could not have been provided by a credit reporting agency and must have been provided by the Millers. *See Downs v. Clayton Homes, Inc.*, 88 Fed.Appx. 851, 853-54 (6th Cir. 2004) (finding that plaintiffs had no claim under § 1681s-2(b) when the plaintiffs did not allege that they had filed a dispute with a credit reporting agency). Accordingly, the court finds that Wells Fargo was not obligated to comply with § 1681s-2(b) in September 2002.

Wells Fargo does not dispute that it received notice of the inaccurate bankruptcy notation from a credit reporting agency on September 22, 2003. Therefore, Wells Fargo can be held liable under the FCRA only for violations arising after September 22, 2003.[6]

## C. Negligent and Willful Noncompliance With § 1681s-2(b)

The FCRA does not indicate the level of investigation a furnisher is required to undertake in order to comply with its § 1681s-2(b) duties. Courts, however, have measured compliance by applying a reasonableness standard. *See Westra v. Credit Controls of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005); *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004) (collecting cases); *see also Brown v. Federated Financial Corp.*, No. 3:05-CV-762, 2006 WL 2847013, at *2 (W.D.Ky. Sept. 28, 2006) (noting that a private cause of action under § 1681s-2(b) exists when a furnisher fails to conduct a "reasonable" investigation). Whether a furnisher has acted reasonably in discharging its 1681s-2(b) duties is generally a question of fact for the jury. *See Westra*, 409 F.3d at 827.

---

[6] Because Wells Fargo cannot be held liable under the FCRA for any violation occurring prior to receiving notice of Mr. Miller's dispute on September 22, 2003, the court need not consider Wells Fargo's argument that the FCRA statute of limitations bars all FCRA claims arising prior to January 21, 2003.

The court finds that genuine issues of material fact exist as to whether Wells Fargo's efforts to comply with its § 1681s-2(b) duties were reasonable. Specifically, on September 22, 2003, Wells Fargo responded to an ACDV sent to it by CSC by verifying that the bankruptcy notation was inaccurate. Wells Fargo then requested that the credit reporting agencies modify Mr. Miller's credit report to remove the bankruptcy notation. This response was in compliance with Wells Fargo's § 1681s-2(b) duties. However, shortly after receiving the ACDV sent by Wells Fargo which verified that Mr. Miller's account had never been included in bankruptcy, Trans Union contends that it received a report from Wells Fargo which updated Mr. Miller's account to once again include the bankruptcy notation. As a result of this alleged "re-report," Trans Union once again began reporting the bankruptcy notation. Such a re-report by Wells Fargo would clearly indicate that it was negligent in complying with its duties under § 1681s-2(b). Wells Fargo, however, denies that it re-reported this inaccurate information. This factual dispute alone renders summary judgment inappropriate as to the Millers' claims for negligence under § 1681*o*.[7]

In addition, summary judgment is also inappropriate as to the Millers' claims for willful noncompliance with its § 1681s-2(b) duties under § 1681n. In order to prevail on a claim for willful noncompliance under § 1681n and recover punitive damages, a plaintiff must show that a defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." *See Stafford*, 262 F.Supp2d at 788. The record clearly indicates that by mid-October 2003, Wells Fargo knew that it had reported inaccurate information regarding Mr. Miller's account and that it was hindering the Millers' ability to obtain credit. A reasonable jury could certainly conclude that a Wells Fargo bankruptcy re-report at this time, coming on the heels of the Millers' repeated contacts and its own

---

[7] Wells Fargo has filed a motion urging the court to strike from the record portions of an affidavit offered by Trans Union in support of its motion for summary judgment after the close of discovery which states that Trans Union received a re-report of the bankruptcy from Wells Fargo. The motion will be denied. However, even if the court were not to consider the affidavit, the deposition testimony of Trans Union representatives William Stockdale and Lynn Romanowski creates a genuine issue of fact as to whether this inaccurate information was transmitted to Trans Union by Wells Fargo.

numerous assurances that it had removed the notation, constituted a conscious disregard for the Millers'
rights.

**D. Damages**

Wells Fargo contends that the Millers are not entitled to relief under the FCRA because they have
failed to demonstrate that they suffered actual damages that are compensable under the FCRA.  Under
the FCRA, any person who is found negligent in failing to comply with any FCRA requirement is liable
to the consumer for actual damages sustained as a result of the failure.  15 U.S.C. § 1681*o*.  If the failure
to comply is willful, a consumer is entitled to actual damages or statutory damages, and punitive
damages.  15 U.S.C. § 1681n.

It is well settled that actual damages under the FCRA are not limited to pecuniary out of pocket
losses but may include non-pecuniary damages for humiliation, mental distress, and injury to one's
reputation and creditworthiness.  *Boris v. Choicepoint Services, Inc.*, 249 F.Supp.2d 851, 859 (W.D.Ky.
2003) (citations omitted). In order to recover for either pecuniary or non-pecuniary actual damages, a
consumer must show that there was a causal relationship between the violation of the FCRA and the
harm.  *See Crabill v. Trans Union, LLC*, 259 F.3d 662, 664 (7th Cir. 2001).

The Millers have asserted actual damages in the form of credit denials, loss associated with
obtaining credit, and mental distress occurring after September 22, 2003, that would be attributable to
Wells Fargo if it is determined that Wells Fargo failed to comply with its FCRA duties.  For example,
the Millers' allege that they applied for a loan with Fifth Third Bank in July 2004 and were required to
close all of their outstanding credit card accounts in order to obtain the loan.  The Millers have provided
evidence that this requirement was imposed as a result of Fifth Third Bank's concerns about the
bankruptcy notation on Mr. Miller's credit report and resulted in the loss of credit and benefits they had
accrued in relation to that credit.  Based on this loss alone the Millers have produced sufficient evidence

to create a genuine issue of fact as to whether they suffered actual damages that are compensable under

the FCRA.[8]

Moreover, proof of actual damages is not necessary in order to sustain an award of punitive

damages under § 1681n. *See TRW*, 534 U.S. at 35. Because an issue of fact exists as to whether Wells

Fargo's actions in this action were willful, the Millers need not prove actual damages.

**E. Standing**

Wells Fargo contends that Mrs. Miller lacks standing to assert FCRA claims in this action. The

FCRA is "interpreted to provide standing to a party when a credit report damages that party's individual

creditworthiness." *Williams v. Equifax Credit Information Services*, 892 F.Supp. 951, 955 (E.D.Mich.

1995). In *Williams*, a wife's ability to obtain credit was affected by an error in her husband's credit

report. The court determined that since she suffered impairment to her own ability to obtain credit when

she was temporarily unable to secure re-financing on property of which she was a co-owner due to the

error of a credit reporting agency, she had standing to sue. *Id.* at 955. In the case before this court, the

Millers have provided sufficient evidence indicating that Mrs. Miller's creditworthiness was damaged

as a result of the bankruptcy notation on Mr. Miller's credit report to withstand summary judgment.

Although Mrs. Miller testified that she had no credit of her own, the record indicates that she jointly

applied for credit with Mr. Miller and that her ability to obtain such credit, and the terms upon which

---

[8] Because this particular loss creates an issue of fact as to whether the Millers' suffered actual damages, it is unnecessary to consider the additional arguments as to actual damages raised by Wells Fargo. However, we note that its arguments that this loss, and other losses associated with the purchase and development of the Beckley Station property, are non-recoverable business losses is unpersuasive. While it is true that the FCRA does not provide compensation for business related losses, *see Cheatham v. McCormick*, No. 95-6558, 1996 WL 662887, at *3 (6th Cir. Nov. 12, 1996), the record in this case does not indicate that losses associated with the Beckley Station property are business losses. At most, the record reflects a genuine issue of fact as to whether the purchase and development of the Beckley Station property was a business venture.

she was able to obtain credit, were affected by the error on Mr. Miller's credit report.   Accordingly,

Mrs. Miller has standing to assert FCRA claims in this action.

### III.  State Law Claims

**A.  Preemption**

Wells Fargo argues that the Millers' state law claims for violation of the Kentucky Consumer

Protection Act (KCPA), outrage, defamation, libel, and invasion of privacy are preempted by the FCRA.

When first enacted, the FCRA had only one section dealing with preemption of state law claims, 15

U.S.C. § 1681h(e).  This section preempts state law claims for defamation, invasion of privacy, and

negligence, to the extent that the plaintiff cannot prove the defendant acted with malice or willful intent

to injure.[9]   In 1996, Congress amended the FCRA to include additional provisions preempting state law

under § 1681t .  The portion of § 1681t relevant to this action is § 1681t(b)(1)(F) which relates to claims

against furnishers of credit information.  Section 168t(b)(1)(F) operates to preempt all state laws that

impose obligations "with respect to the subject matter regulated under [15 U.S.C. § 1681s-2]... relating

to the responsibilities of persons who furnish information to consumer reporting agencies."  15 U.S.C.

§ 1681t(b)(1)(F).

Courts have recognized that the FCRA's two preemption provisions overlap and are potentially

contradictory.  *See e.g. Stafford*, 262 F.Supp.2d at 784;  *Manno v. American General Finance Co.*, 439

F.Supp.2d 418, 424 (E.D.Pa. 2006); *Johnson v. Citimortgage, Inc.*, 351 F.Supp.2d 1368, 1373 (N.D.Ga.

2004).  The tension between these two provisions results from the fact that § 1681h(e) permits state tort

claims against furnishers, but requires a higher standard of proof for those claims in the nature of

---

[9] Section 1681h(e) states that "no consumer may bring any action ... in the nature of defamation, invasion of
privacy, or negligence with respect to the reporting of information against... any person who furnishes information to
a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title,
or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken
adverse action, based in whole or in part on the report except as to false information furnished with malice or willful
intent to injure such consumer."

defamation, invasion of privacy, and negligence, while § 1681t(b)(1)(F) prohibits all state claims against

furnishers.  *See Stafford*, 262 F.Supp.2d at 785.  Courts attempting to harmonize these two provisions

have generally followed one of three approaches: (1) the "total preemption" approach; (2) the "temporal"

approach; or (3) the "statutory" approach.  *See Manno* 439 F.Supp.2d at 424-25 (discussing the differing

approaches).

Court's applying the "total preemption" approach hold that  § 1681t(b)(1)(F) preempts all state

law claims against furnishers. *See e.g. Hasvold v. First USABank*, 194 F.Supp.2d 1228 (D.Wyo.2002);

*Purcell v. Universal Bank*, N.A., 2003 WL 1962376 (E.D.Pa April 28, 2003).  Under this approach §

1681t(b)(1)(F) is interpreted to supersede and effectively repeal § 1681h(e) even though Congress left

§ 1681h(e) in place and did not address it when adding § 1681t(b)(1)(F).  This court expressly rejected

the total preemption approach in *Stafford*. 262 F.Supp. at 786.

Courts applying the "temporal"approach identify two discrete time periods covered by the two

preemption sections.  Under this temporal approach, the first time period ends once the furnisher of

information receives notice of a dispute.  The reasoning behind this approach is that § 1681s-2 does not

apply to impose any duty upon the furnisher in the time period before the furnisher receives notice of the

dispute and, therefore, preemption of claims during this first time period is governed by § 1681h(e).  The

second time period under the temporal approach begins once the furnisher receives notice of the dispute,

triggering the furnisher's § 1681s-2(b) duty to investigate.  Therefore, the state law claims that arise

during the second time period are preempted by § 1681t(b)(1)(F).  *See e.g. Stafford*, 262 F.Supp.2d at

785; *Aklagi v. Nationscredit Fin.*, 196 F.Supp.2d 1186 (D.Kan. 2002); *Vazquez-Garcia v. Trans Union

De Puerto Rico*, 222 F.Supp.2d 150 (D.P.R. 2002).  Although this court adopted the temporal approach

in *Stafford*, this court did not, at that time, consider the "statutory" approach.

Courts applying the "statutory" approach hold that § 1681t(b)(1)(F) applies to preempt only state

claims against furnishers brought under state statutes, while § 1681(h)(e) applies to preempt state tort

- 14 -

claims. *See e.g. Manno*, 439 F.Supp.2d at 425; *Johnson.*, 351 F.Supp.2d at 1376; *Barnhill v. Bank of Am., N.A.*, 378 F.Supp.2d 696 (D.S.C. 2005); In *Manno*, the court set forth a number of reasons as to why the statutory approach is the approach most consistent with an analysis of the statutory text and with the congressional intent underlying § 1681t(b)(1)(F):

> [Interpreting § 1681t(b)(1)(F) to preempt only state statutory claims against furnishers] reflects the fact that, in enacting t(b)(1)(F), Congress seems to have been most concerned with protecting credit information furnishers from state statutory obligations inconsistent with their duties under the FCRA. *See Carlson v. Trans Union*, 259 F.Supp.2d 517, 521 (N.D.Tex.2003) ("Section 1681t(b)(1)(F) gives every indication of dealing only with state statutory regulation.").
>
> Congress clearly had state statutes in mind when it enacted t(b)(1)(F), because it specifically exempted two state statutes from preemption:
>
> > [T]his paragraph shall not apply ... with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or ... with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996).
>
> *Id*. Congress's explicit exclusion of a Massachusetts and a California statutory cause of action from preemption by t(b)(1)(F) is a strong indication that Congress intended t(b)(1)(F) to preempt statutory claims. This focus on state statutory claims becomes even more evident when all the preemption provisions of 1681t are read together as a whole. In addition to the exemptions from t(b)(1)(F) for certain Massachusetts and California statutes, 1681t contains no less than ten additional exceptions to preemption for specific state statutes...
>
> Moreover, two subparagraphs of 1681t-t(b)(1)(B) and t(b)(1)(E)-provide that they "shall not apply to any State law in effect on September. 30, 1996," the effective date of the 1996 amendments to the FCRA. This indicates that these provisions were intended to preempt only state regulations enacted after the passage of 1681(t). Because it makes no sense to speak of tort causes of action, derived from English common law, as coming into "effect" after a specific date in 1996, any such subsequent state enactments would have to be statutory in nature. As one court has observed: "As § 1681t now stands it may make common sense to read [this section] as applying to state statutory regulations that overlap with the FCRA rather than with state common law torts which have elusive 'effective' dates." *Watson v. Trans Union*, 2005 WL 995687, at *8 n. 8 (D.Me.2005).
>
> Indeed, 1681t provides that "no requirement or prohibition may be imposed under the laws of any State" with respect to various types of conduct regulated by the FCRA. 15 U.S.C. § 1681t(b) (emphasis added). This language, while a natural-sounding way of forbidding state legislatures to "impose" statutory "requirements" and "prohibitions" on parties subject to the FCRA, would be an awkward, roundabout way of forbidding state

courts to interpret tort law to "impose requirements or prohibitions." If Congress intended 1681t to preempt state common law tort actions, it knew well how to express this intent in the statutory language. It need only have mirrored the language of 1681h(e): "*[N]o consumer may bring any action or proceeding* in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency...." *Id*. (emphasis added).

Moreover, the fact that Congress made no mention whatsoever of 1681h(e) when enacting 1681t is in itself evidence that 1681t was not meant to preempt tort causes of action. If Congress had so intended, one would have expected some acknowledgment of the existence of 1681h(e), the FCRA provision that specifically addresses the preemption of state tort claims. Rather than ascribing this omission to congressional forgetfulness, the statutory approach presents a much more satisfactory explanation: Congress had no need to address 1681h(e) when enacting 1681t because the former relates solely to torts, while the latter relates solely to statutes.

By the same token, interpreting t(b)(1)(F) to preempt only statutory claims makes this newer preemption provision harmonize with 1681h(e). See *DiPrinzio*, 2005 WL 2039175 at *6 ("When read alongside section 1681t(b)(1)(F) ... the symmetry is clear: section 1681h(e) applies to state common law and section 1681t(b)(1)(F) applies to state statutes."). "[S]tatutory provisions enacted at different times should be read as harmoniously as possible, so that each is given effect and the provisions do not conflict." *Pennsylvania v. Dep't of Health and Human Servs.*, 723 F.2d 1114, 1119 (3d Cir.1983). Under the statutory approach, the two provisions can easily be read together to shield credit information furnishers against, on one hand, state statutory claims, and on the other hand, state tort actions not involving willful or malicious conduct.

439 F.Supp.2d at 425-26. This court finds the reasoning set forth in *Manno* to be persuasive and will adopt the statutory approach to harmonizing §§ 1681h(e) and 1681t(b)(1)(F). Although this court has utilized the temporal approach in the past, we find the temporal approach to be less consistent with the language and intent of § 1681t(b)(1)(F).[10] Accordingly, in applying the statutory approach, because the

_____

[10] *See Johnson*, 351 F.Supp.2d at 1374-75 ("[T]he court finds the practical effect [of the temporal approach] troubling. The newer statute, [§ 1681t(b)(1)(F) ], provides furnishers of information with much greater protection (potentially no lawsuits) than does the older statute, § 1681h(e) (allowing defamation actions premised on malice or willfulness). To read the two statutes in [this way] has the effect of giving a furnisher of information more protection from exposure to liability for acts committed after receiving notice of dispute than for acts committed before such notice. It seems odd to this Court that Congress intended to protect furnishers of information more once they have knowledge that a consumer is disputing an item on his credit report; one would, logically, expect the opposite policy. This Court, therefore, declines to adopt such a reading.") (citation omitted).

Millers' claims against Wells Fargo for violation of the Kentucky Consumer Protection Act are statutory causes of action, they are preempted by § 1681t(b)(1)(F) and Wells Fargo is entitled to summary judgment as to these claims.

The Millers remaining state law claims are tort claims and, under the statutory approach, are not preempted by § 1681t(b)(1)(F). The court must therefore consider whether such claims are preempted by § 1681h(e). As previously discussed, to the extent that information was not furnished with malice or willful intent to injure a consumer, § 1681h(e) preempts a consumer's state law claims "in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against... any person who furnishes information to a consumer reporting agency." 15 U.S.C. § 1681h(e).

Courts have held that in § 1681h(e) cases, a statement is made with "malice" if it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Stafford*, 262 F.Supp.2d at 789 n.11; *see also Jordan v. Trans Union LLC*, 377 F.Supp.2d 1307, 1309 (N.D.Ga 2005); *Graham v. CSC Credit Services Inc.*, 306 F.Supp.2d 873, 882 (D.Minn. 2004). Because the facts that create an issue of fact as to whether Wells Fargo willfully violated the FCRA in this case also create an issue of fact as to whether it reported that Mr. Miller had filed for bankruptcy with knowledge that such a report was false or with reckless disregard as to whether it was false or not, we find that § 1681h(e) does not afford qualified immunity to Wells Fargo in this case.

**B. Defamation**

In Kentucky, "[d]efamation by writing... is libel." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793-94 (Ky. 2004). Thus, the Millers' claims against Wells Fargo for defamation and libel are one and the same. A prima facie case for defamation requires proof of (1) defamatory language, (2) about the plaintiff, (3) which is communicated to someone other than the party defamed, and (4) which causes injury to reputation. *Id.*

A report indicating that Mr. Miller had filed for bankruptcy when he had not done so is clearly defamatory. *See id.* ("defamatory language is broadly construed as language that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him"). The Millers have provided evidence that Wells Fargo provided this bankruptcy notation report to numerous third parties and that Mr. Miller's reputation was injured as a result of the false reports. As such, summary judgment is inappropriate as to Mr. Miller's claim for defamation against Wells Fargo. However, because Wells Fargo did not report defamatory information about Mrs. Miller, her claims for defamation must be dismissed.

## C. Invasion of Privacy

In Kentucky, the right to privacy is invaded by (1) unreasonable intrusion upon seclusion of another, (2) appropriation of the other's name or likeness, (3) unreasonable publicity given to the other's private life, or (4) publicity that unreasonably places the other in a false light before the public. *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 887. The Millers' claims against Wells Fargo for invasion of privacy are based on their allegation that Wells Fargo placed them in a false light by falsely reporting that Mr. Miller had filed for bankruptcy.

In order to sustain an action for false light invasion of privacy, a plaintiff must demonstrate that (1) the false light in which he was placed would be highly offensive to a reasonable person and, (2) the publisher had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed. *Id.* at 888. A false report that Mr. Miller had filed for bankruptcy would clearly be highly offensive to a reasonable person, and an issue of fact exists as to whether Wells Fargo had knowledge that Mr. Miller had not filed for bankruptcy. Accordingly, Wells Fargo is not entitled to summary judgment as to Mr. Miller's invasion of privacy claim. However, because Wells Fargo did not report false information about Mrs. Miller, her claim for invasion of privacy must be dismissed.

### D. Outrage

To establish a prima facie case of outrage under Kentucky law, a plaintiff must show that (1) the wrongdoer's conduct was intentional or reckless, (2) the conduct was outrageous and intolerable in that it offends the generally accepted standards of decency and morality, (3) a causal connection exists between the wrongdoer's conduct and the emotional distress, and (4) the emotional distress was severe. *Stringer,* 151 S.W.3d at 788. In *Stringer*, the Kentucky Supreme Court held that the conduct at issue must be "extreme and outrageous" noting that:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

151 S.W.3d at 789 (quoting Restatement (Second) of Torts § 46(1) cmt. d). Wells Fargo's conduct does not rise to the level of "extreme or outrageous" as required by Kentucky law. Accordingly, the Millers' outrage claims against Wells Fargo for will be dismissed.

A separate order will be entered herein this date in accordance with this opinion.